The next matter, number 162066 Clement C. Benenson v. Commissioner of Internal Revenue and number 162067 James Benenson v. Commissioner of Internal Revenue. Thank you, Your Honor. I'd like to reserve five minutes for rebuttal. Five minutes? You may have three. Okay, thank you. Neal J. Block for Petitioner's Appealants James and Clement Benenson. Can you move that mic a little closer to yourself, please? Is this better? Okay, and I'm with Robert Walden, School Counsel. May it please the Court, I'd like to state that our position in this case is really based upon the fact that the Sixth Circuit has determined that the commissions paid by Suma Corporation to a disc constitute a deductible, disc expenditures, and that decision is final. It was not appealed to the Supreme Court. The case court has referred to this decision. Counsel, your briefs are very good, and we have read them. If I could urge you to get to the merits and simply rely on your brief on all of your Sixth Circuit precludes us from reaching the question, I'd appreciate it. It's not clear to me that the Sixth Circuit, well, I don't believe it's binding on us, but more than that, it's not at all clear to me that it's dealing with the same issue which is before this court, which doesn't have to do with Suma's payments but has to do with what the Commissioner says is dividends that were, in economic reality, it was dividends that were used for contributions well above the contribution limit to the Roth IRAs. Let me just help you because this is a very hard case, and I do want your argument to be addressed to our issues. I view this, in the end, as a question about whether Congress has indicated clearly that the Commissioner is precluded from using the substance over form doctrine to recharacterize these Roth IRA contributions. It is true there are some Treasury Department regs that preclude the use as to Suma's initial activities, but so could you help me with answering, within that context, my questions because I have to tell you, I don't see any Congressional intent here to do what you think Congress intended. Okay, thank you. If you don't mind me starting with the Addison International case and the Jet Research cases, which were decided by the 6th Circuit and by the Tax Court, in which there was a disqualified disc, and both the government and the taxpayer argued that since the disc was disqualified, they were not subject to the normal disc rules that apply substance over form principles, and both courts said no, the way the structure is that Congress intended that the disc effectively be a fortress against attacks under substance over form, otherwise it would destroy the integrity of the disc. Why is this the same question as that? This is the same question in that Congress addressed the issue of having a disc stock owned by an IRA and applied a substance over form analysis to say that we are not going to allow the disc to be transferred into an IRA because the IRA was distributing the disc income free of tax, and this violated Congress's intent to tax the deferred income which was being allowed to the taxpayer by putting a disc omission to the disc or to the IRA because there was no provision for such taxation. So Congress said, we realize there's been an assignment of income from the related supplier, which should have been taxed, and it's gone into a tax-exempt vehicle, and the original legislation was not to the IRA, it was to other tax-exempt vehicles, but going in there free of tax, and therefore we are imposing a tax on the dividends of the disc to these exempt entities, and specifically they did not disallow the deduction, nor did they treat that as an excess contribution. They said we are going to treat this as a taxable dividend in order to tax the deferred income which was being allowed by virtue of the fact that the disc was being used to shift income into the disc as an assignment of income which are normally taxable to the related supplier. So at least I assume that what the IRS objects to is that your clients, by doing this, were able to shelter a lot of income into the Roth IRA and get the advantage of growth once the money got there. Is that not... Weren't there two benefits? One is that the money accumulates in the Roth IRA without paying taxes, and then when the distribution is finally made... That's redistribution. Well, there's two things. One, the distribution has to be made after the beneficiary obtains money to 59 and a half, which is not necessarily a given. Second, in terms of the upfront cost, especially in this case, we find that the dividends from the disc to the holding company are the same as the Roth IRA. We're taxed at 43% plus. If the same disc stock had been held by the beneficiary directly, they would have been taxed at 15%. So there's a big upfront cost to them in getting the funds into the disc. Yeah. Okay. So some taxes were paid, but you stipulated that the purpose of this intermediary corporation, that there was no business economic purpose to it. It was merely to end up in a result which reduces taxes. The intermediary was not set up for any purpose other than to allow the disc to be managed by the Benson family and free of the ownership of the Roth IRA. That made it easier for them to manage the company and to keep the Roth IRA fiduciary out of the business of the disc. In other words, the holding company was receiving dividends from the disc. They were there and being managed by the holding company, distributed out, taxes paid, and therefore, from an economic point of view, it served that purpose. We never stipulated that the holding company was organized for tax avoidance purposes, only that the disc was being utilized for that. But did you not stipulate that there was no business purpose? We stipulated that the establishment of the Roth IRAs was for tax avoidance because that's what it was established for. And you're claiming that that's what this whole procedure was set forth by Congress to permit you to do that. That's your basic premise. It's our premise in that when Congress had the opportunity to address this exact structure, Congress did not say that we're not going to allow it. Congress just said we're just going to change the taxation formula so that the disc limited ourselves in taxing the recipient. Okay, so I'm beginning to understand it a little better. Thank you. You say it was when Congress chose a different form of taxation that implicit in that was a decision by Congress to preclude the Commissioner from using this rule of statutory interpretation, which is time-honored, which the Supreme Court has repeatedly said the Commissioner is free to use. There's no explicit statement from Congress, is there, that the Commissioner may not use the substance over form doctrine as to this aspect of the transaction? Do we agree on that? Yes, but. Yes, but. Okay, now what's your but? The fact is that it is inconsistent for Congress to state that disc dividends are to be taxed to the IRA knowing there were going to be substantial amounts of money going into the IRAs, not just $2,000 because in the case we looked at, there's been substantial amounts of money. In so doing, it is inconsistent to say that, well, there's no prohibition against disc dividends being treated as investment income by an IRA, but there is an inconsistency of saying that once you cast that income into the IRA, that there is open evidence saying, well, you still have violated the contribution limits when the disc dividends don't violate the contribution limits because they're investment income. So the only way you can get to the point that Congress, quote, did not specifically state something, is that Congress honestly assumed that they were going to take care of the problem of using the Roth or the IRA and spending of income by casting that income to the IRAs. Well, it's a decent argument, but Congress is frequently inconsistent. And why do we derive from that that it intended to restrict the powers of the commissioner that normally exist? I think the Sixth Amendment said that when you read 995G, you get the same result. And I just want to make the point is that other cases were decided by other courts saying that the only way to keep a disc in its structure and its doing the job it was created for was to prevent any substantive amendments. By regulation or anything else. Can you give us the Addison case? Well, if you look at the Addison case, Arrow Fasteners is one case in which they cited another case. I can't remember which one it was. The Caterpillar Tractor case, which is one which involved the disc in a WHTC, which was the predecessor of the disc saying that there was no restriction against such a use of two TX exempt vehicles. Okay. Matt, you've got three minutes of rebuttal. Thank you, ma'am. Good morning. May it please the Court. Ellen Hillsall from the Department of Justice for the Commissioner of Internal Revenue. This is a transaction in which there wasn't any economically real investment by the Roth IRA. What happened here was basically what was set up was essentially a spigot controlled by appellant's father that could move funds from SUMA through these intermediaries into the Roth IRAs. He controlled when money was moved and how much. But isn't this what the whole disc arrangement permits? I mean, if you look step by step, nothing that they did seems to violate what the statute allowed. What you're saying is that when you get all done with it, it doesn't look right, and therefore we should be allowed to reconstitute it and set aside what they've done. Well, Your Honor, this is a time-honored principle that the Supreme Court has recognized, going back to Gregory B. Hellring in the 30s. But if you take your argument to its extreme, you can do this on almost anything, can't you? Well, I think the important thing that the Supreme Court has emphasized is looking at what is it that the statute intended. And here, Congress laid out a very express provision limiting what's contributed to the Roth IRAs. And what the courts have said, including the Bergerson case and the Supreme Court in cases like court holding, Minnesota Tee, and Gregory B. Hellring, is that you look to the whole transaction to see whether what really happened at the end of the day was what the parties intended. And in that respect, that it's important to look at certain guideposts, like was there family control that moved the money? Was there really the risk that's normally associated with an investment? Well, once the investment is made in the IRA, there's always a risk with the investment. They could take all that money and invest it poorly and have poor results. Well, the bottom line is that this wasn't a real equity investment. I mean, as the court talked about in historic work where we'll call it an OPP holding, which we discussed in our supplemental brief and also in the TIFD3 case that's in our answering brief, these cases make clear that for there to be a real investment, there has to be some economic risk. And here we had an established company, SUMA, and these taxpayers just set up this scheme where the money moved through the intermediaries. And it was stipulated, just to answer one of the questions that was raised in stipulation paragraph 36, it was stipulated that all these entities, J.C. Export, J.C. Holding, and the DISC, had no business purpose, that they were set up solely for this scheme of avoiding the Roth IRA contribution limits. In essence, I understand your opponent's argument to be Congress set up an alternative tax scheme that sort of took this out of the normal limits for IRA contributions, that these entities end up paying some taxes, perhaps not what the commissioner would like, but that that choice of an alternative scheme means that inherently the commissioner could not recharacterize these transactions. I may have misunderstood, but what's your direct response to that? Well, I'd like to address, I mean, they're really two separate points, 995G and the Addison and Judd research cases. 995G is what they argue, it says basically that these DISCs, the Roth IRA can own the DISC. And I think in that context, when Congress enacted that statute, it was 10 years before Roth IRAs were ever even conceived of. So this particular scheme certainly didn't come to Congress's mind. And Congress was trying to curtail another abuse where they were using, where taxpayers were using tax-exempt entities to own DISC stock and basically pay no tax at all because it's the shareholders that ultimately pay the tax. And then Congress said, well, there will be a tax, which is not the issue here that was paid at the point where there's a distribution from the DISC, even if it's a tax-exempt entity. And I think in that context, Congress didn't conceive of the idea that then the DISC would be basically used as just a conduit to move money into Roth IRAs and contribution limits. At the time, Roth IRAs didn't even exist. IRAs had contribution limits. But I think the fact that Congress mentions IRAs in passing in the legislative history certainly doesn't give any indication that it contemplated this. It's very different from, for example, the Stevenson's Trust and some of the cases cited in the briefs that the taxpayers rely on here, where they are talking about situations where Congress has revisited and revisited a situation and the abuse has been pointed out and Congress has declined to act. But isn't it typical Congress may pass a statute and not recognize all of the ways it may have unintended consequences? That's what legislation does. And what you're saying is that the IRS, looking at this, says, well, if Congress had looked at this, they would have wanted this to happen and therefore we can reconstitute. That's your basic argument. His basic argument is, look, this was permitted. So how do we decide this? The Supreme Court has decided it already, and I think court holding is a very good, simple example that illustrates that where Congress has permitted something but not recognized all the ways that taxpayers can put transactions together to avoid tax, that this substance of reform doctrine allows courts to look at the situation and say, well, given all these factors that indicate that this was something Congress never anticipated, where the scheme runs afoul of a specific limitation that Congress imposed, that then it's appropriate for the courts to step in. And I think the C&T investment case recently from the tax court provides a particularly good explanation of the history of this doctrine and how it should apply and the importance of it. It seems to me part of your reply to Judge Stahl is what we're talking about here is a statute before Roth IRAs ever existed. So it's not sort of an unintended consequence. When Roth IRAs were in fact created, Congress created limits on the amount of money an individual taxpayer can put in the IRA and certain high-income taxpayers couldn't take advantage of that at all. So the question then is why shouldn't that apply even in the face of 995G, which plainly didn't contemplate Roth IRAs? Well, yes, that's exactly the point, that the limits should apply and failing to specifically spell out that this sort of scheme wouldn't be permissible is just a reflection of the fact that Congress can't possibly contemplate every scheme that taxpayers can come up with to parse together pieces of the code to try to avoid tax. And I think that's exactly what the D.C. Circuit's point was in ASA Investoring when it talked about the importance of the judicial doctrines for addressing these sorts of situations for taxpayers. You were also going to reply to his reliance on the Addison case? Yes, Your Honor. He suggested Addison and research suggests that substance of reform can never apply in the D.I.S.C. context, and I think that's really a mischaracterization of those cases in that they really don't have any relevance at all to the situation. Those cases dealt with a disqualified D.I.S.C. The D.I.S.C. regime basically allows taxpayers to designate an entity to be a D.I.S.C. and to be treated as a D.I.S.C. And then if the requirements for a D.I.S.C. aren't met, the D.I.S.C. can become what's called a disqualified D.I.S.C., which basically means it's sort of still a D.I.S.C., but it's a disqualified D.I.S.C., it's not a regular C. Corporation yet. And during that entity, then the question arose of, is money that's passed from the parent to the D.I.S.C. that normally, or the related supplier to the D.I.S.C. that normally under the D.I.S.C. regime wouldn't have to be an arm's length transfer, then the substance of reform principles apply to assign that income back to the parent. And the court said, in this particular situation, Congress has laid out a very specific scheme that says how this money is going to be taxed in the case of a disqualified D.I.S.C. And it didn't say that anything involving a D.I.S.C. can never involve substance of reform, but rather, in this particular instance, Congress has laid out what's supposed to happen when the D.I.S.C. becomes disqualified, and we're going to follow the specific steps Congress laid out. Okay, one of the curious things about this case to me is that at least three different cases were bundled together before the tax court for whatever reason, maybe it was strategic. And the Sixth Circuit has rejected the Commissioner's position in the Summa case. I believe you are arguing whether or not the Sixth Circuit was right in that case. We have at least an alternative theory in this case. So the Sixth Circuit could be right, but we still win as to these two taxpayers. Have I understood that correctly? That is correct, Your Honor. Okay, would you spell out then what you think that theory is? The alternative theory, Your Honor? Yes. Well, I think if, in the event that the court finds that it can't actually attack the,  or we prefer not to get into whether the Sixth Circuit is right or not. I think once the money leaves the disk, it's, I mean, the only issue this court has to decide is once the money leaves the disk, is it being under the control of the same taxpayers it started with being moved into these Roth IRAs, and do they control how much is being moved and when, as opposed to this being an investment that depends on the chance of some companies' fortunes. And I think what we're saying is that basically what should be happening here, and what we've argued in the Second Circuit, is that this should be treated as dividends to the consumer shareholders because basically they're passing the money back to themselves. And there's a long line of constructive dividend case law that supports the idea that once, you know, if you're distributing money from a corporation to the shareholders, no matter what you make it look like, if that's what happens at the end of the day, that's a dividend. And then that money is transferred to the Roth IRAs under the family control. Have you yet had oral argument before the Second Circuit? No, Your Honor. Our answering brief was just filed on September 15th, and the reply brief is, I believe, due on extension, I think it's October 9th. They asked for an extension of time on the reply brief. Okay, have they scheduled oral argument? They have not yet scheduled oral argument. This is just a curiosity question. This case has been kicking around for a while. Has anything happened legislatively concerning this entire area? Your Honor, to my knowledge, nothing has happened legislatively beyond my sending an email to my section chief saying, this is something that you all should pass up the chain for legislative attention. But I mean, because I think it is something that is... Because the Sixth Circuit said, look, if this is your problem, Congress can fix it. But I think part of the problem is that Congress has a lot of things to fix, and they don't always get to these little things. But this is not, from your point of view, this is not a little thing. It's not, but I mean, compared to health care perhaps, compared to overall tax issues, packages that are before Congress, I think this may be, from their perspective, something that they may or may not address in the near future. And in the meantime, taxpayers who are wealthy enough to have an export company can be shifting millions into their Roth IRAs for tax-free investment, while the rest of us are confined to $5,000. So you're the Treasury Department's expert lawyer on these DISC questions? I'm not sure that I am the absolute expert within the Treasury Department, but I would say I certainly developed a fair amount of expertise, Your Honor. So there are other wealthy families, like the Bennisons, who have apparently used this device. Does Treasury have any estimate as to the amount of money involved, from their point of view, as to excise penalties that haven't been paid to them? Well, I think that the exact number is somewhat speculative, and I'm not aware of a projection in that regard. And I think there are two factors in terms of the excise taxes. It's a 6% excise tax for any excess contributions per year as long as the excess continues. And there are options that the taxpayers have, if they were to lose this case, to keep the money in and hope that their returns match up with their excise tax, or to draw the money out and face penalties for early withdrawal. So I think there's a lot of speculation there, particularly because, you know, obviously market changes and what an individual's gamble is in terms of risk would differ. But I would say that certainly the risk for abuse in this area is very substantial. And there's a Wall Street Journal article that we cited in our supplemental brief that I think really spells out that this is opening the doors to a lot of abuses and certainly a significant amount. Gosh, if you go down that road, the New York Times is going to want equal time. Well, I cite that merely because I pointed out that particular article in our brief. How much parallel litigation is going on? I'm sorry? How much parallel litigation is going on over this issue? Right now, the only cases in the courts are these three cases, and there's another case involving a Foreign Scales Corporation, which is a similar entity to a DISC that's in the tax court that would be appealable to the Ninth Circuit. And there are additional cases in the exam process, but I'm not sure what the exact numbers are in terms of how much is at issue in those. And, again, it's speculative. I mean, as Mr. Block pointed out, up front, there's not a big tax gain here because the money does get taxed when it comes out of the DISC. What matters is really is that this over the long term stands to be a huge boon in that there are no capital gains taxes during the time the money is invested and when it's drawn out. I see my time has expired. Maybe this is an argument for tax reform. I see my time has expired. If there are no other questions, I'll rest my brief on the remaining issues. Thank you. Thank you. Thank you, Your Honor. First, I'd like to point out that the 408 cap a small a says that unless otherwise provided in the code, sitting regulations require the same thing, that the same rules apply to traditional IRAs, to Roth IRAs as traditional IRAs. Traditional IRAs had a contribution limitation, same as the Roth IRAs. I didn't mention anything about contribution limits. I'm sorry. Could you give us the section again that you're referring to? 408 cap a small a. It's the first sentence of the Roth IRA provisions stating that unless otherwise provided basically in the code, that the same rules apply to Roth IRAs as traditional IRAs. Also, the reason that we emphasize the fact that the Sixth Circuit should be respected in its opinion is because it decided that the discommission was an allowable deduction and that based on the arguing position of the commissioner, that the discommission could be recharacterized as an IRA contribution or excess contribution. The court said no, it can't because it's a deductible dividend. And that case is final and the tax court has already reversed its opinion based on the fact that the discommission was deductible rather than not. The third thing is that when talking about 995G, the disprovision was a result of a 1989 amendment to the original 995G because 995G originally did not include the DISC. And now the amendment was placed and the example in the amendment is exactly the situation that we have now except for the holding company. The Roth IRA is only, again, profitable if the investments in other than the DISC dividends are yielding a profit. And during the years when this was doubtful that there was much of a profit at all, it could have been a loss because the investments of the DISC would have been subject to the market risk and during that time the market was going down. So the point is, is there still risk? Of course there is and it's the same risk as any other investor. The money is coming in on an after-tax basis and it's being taxed. So in order to make it work, the tax has to be recovered plus a profit by the time the money is withdrawn from the IRA. Then why did you enter the stipulation you entered? Aren't you saying something inconsistent here? I don't believe we are. I think the parties invested in the Roth IRA in order to avoid taxation, but they still had to earn the income in order to avoid the taxation. I don't think there's anything inconsistent about that. If there is, I'll try to explain it further. But that was the basis of our statement. I think that should do it. I think we've made our points. Thank you very much. Okay.